

# NUMBER 13-09-00083-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

BECKHAM RESOURCES, INC.
AND KLA ENERGY, INC.,                                    Appellants,

v.

MANTLE RESOURCES, L.L.C., WILLIAM F. MILLER,
C.F. FUNDS, INC., AND JIM C. SNYDER,                     Appellees.

## On appeal from the 267th District Court
## of Refugio County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Rodriguez and Garza
Memorandum Opinion by Justice Rodriguez**

This appeal arises from a dispute over an oil and gas lease in Refugio County, Texas. Appellants Beckham Resources, Inc. and KLA Energy, Inc. complain of the motions for summary judgment and motion for instructed verdict granted in favor of appellees Mantle Resources, L.L.C., William F. Miller, C.F. Funds, Inc., and Jim C. Snyder

and which, when considered together, disposed of all of appellants' claims against appellees.[1] By four issues,[2] Beckham argues that the trial court erred in: (1) granting Mantle's motion for summary judgment on Beckham's claim that Mantle breached certain provisions of the joint operating and exploration and development agreements between the parties; (2) granting Mantle's motion for summary judgment on Beckham's claim that Mantle breached a certain letter agreement between the parties and breached a fiduciary duty owed; (3) granting Mantle's motion for instructed verdict on Beckham's fraud and negligent misrepresentation claims; and (4) awarding attorneys' fees to Mantle where no evidence supported the award and the fees were not segregated. We affirm.

## II. BACKGROUND

### A. The Scanio-Shelton Lease

Beckham is a company that develops oil and gas properties. In 1999, Beckham acquired a lease in Refugio, Texas, from the Scanio-Shelton family (the Lessors). Beckham developed the property, which resulted in oil and gas production and revenue for both Beckham and the Lessors. Beckham then sold ten percent of its interest in the Scanio-Shelton lease to KLA. For reasons not entirely clear from the record, a dispute over the lease arose between Beckham and the Lessors. The dispute was resolved without litigation, but the relationship between Beckham and the Lessors was strained from that point forward.

---

[1] In their briefing, both parties refer to appellants collectively as "Beckham" and appellees collectively as "Mantle." For ease of reference, we will do the same in this opinion, unless the context requires otherwise.

[2] In its brief, Beckham presents two issues: first, that there are, generally, fact issues remaining on its claims against Mantle; and second, that there is no evidence supporting the trial court's award of attorneys' fees to Mantle. For purposes of our analysis, we have reorganized Beckham's two general issues as four more specific issues. *See* TEX. R. APP. P. 47.1.

## B.  Beckham and Mantle's Relationship

In February 2004, Beckham sold seventy-five percent of its interest in the Scanio-Shelton lease to Mantle.  As consideration for the acquisition, Mantle paid Beckham $395,000 and agreed to drill five new wells on the property.  Mantle was responsible for the up-front costs of the five new wells; after that, the proceeds were shared between the parties according to their respective ownership shares—i.e., seventy-five percent to Mantle and twenty-five percent to Beckham.  The five wells were completed without controversy.

Beckham and Mantle's relationship was governed by two agreements—an exploration and development agreement (the exploration agreement) and a joint operating agreement (the JOA).  The JOA outlined the manner in which the parties would finance wells on the leased property after the first five that were drilled as consideration.  The parties agreed that new operations would be subject to a "non-consent" clause, which meant, in short, that if one party proposed an operation, the other party had a choice to participate or not.  Under the non-consent clause, if one party had chosen not to participate, the party who proposed the new operation would bear full responsibility for the up-front costs of drilling the well.  The participating party would then be allowed to recover its costs out of production from the well until a stated percentage—here, 200%—was recovered.  The percentage was meant to be a penalty to the non-consenting party.  After the participating party recovered this amount, the non-consenting party would begin to receive its share of production from the well.

The exploration agreement contained an "area of mutual interest" clause (the AMI), which governed a large area around the lease and provided that if either party acquired an oil and gas interest within that defined area, the acquiring party was required to offer the

3

other party a share of that acquisition in proportion to its ownership under the original lease. The AMI read, in relevant part, as follows:

> Any Party acquiring an "oil and gas interest" within the AMI shall notify the other Party in writing of such acquisition, which notice shall include all pertinent terms of such acquisition (the "Notice"). For purposes of this Agreement, an oil and gas mineral interest shall include any leasehold, working interest, overriding royalty interest, mineral interest, royalty interest, farm-out, farm-in, or any other oil and gas interest of any nature or kind. The non-acquiring Party may elect to participate for its proportionate share in the acquisition by giving written notice of its election to the acquiring Party within ten (10) days from receipt of the Notice. A party electing to participate in an acquisition shall make payment of its proportionate part of all acquisition costs within twenty (20) days of its election. A Party's failure to timely elect or make its payment thereafter shall be deemed an election not to participate in the acquisition.

## C. The May 2004 Lease

In May 2004, Mantle entered into a new lease with the Lessors (the May 2004 lease), and pursuant to the terms of the exploration agreement, assigned Beckham twenty-five percent of its interest in the new lease.[3] However, to obtain the Lessors' consent to the new lease in light of the strained relationship between Beckham and the Lessors, Mantle agreed to certain conditions in the lease that would eliminate any contact between Beckham and the Lessors and allow Mantle the right to execute a release on Beckham's behalf regarding its interest in the lease. Specifically, the May 2004 lease contained the following language:

> This Lease may not be assigned by the Lessee [Mantle] . . . without the express written consent of the Lessor . . . . Should any assignment as to all or any part of the leasehold, or any interest therein, or as to any segregated

---

[3]The five wells Mantle agreed to drill as consideration for the February 2004 assignment from Beckham were drilled under the May 2004 lease. This lease also contained a "continuous drilling" clause, which required the lessees (Mantle and Beckham) to commence drilling a new well within 120 days after completion of any prior well.

acreage covered by the Lease, be made by Lessee, or should any subsequent assignment be made by any assignee, the Lessee shall have the right to execute and deliver a release or partial release of the Lease in accordance with the other release provisions of this Lease without the joinder or approval of any other leasehold interest owner. . . . Any such action by the Lessee . . . shall be as the agent and attorney-in-fact for all other leasehold interest owners at the time of granting any release or partial release. It is agreed that the purpose of naming and appointing the Lessee . . . as the agent and attorney-in-fact is to allow the Lessor to look to only one party for execution and delivery of any release . . . . Each assignee of an interest in the leasehold estate shall be bound by this provision and grants to the Lessee . . . the right to release, in whole or in part, an assignee's interest, as may be deemed necessary and proper by the Lessee . . . in accordance with other provisions of this Lease.

This language was used in Mantle's assignment to Beckham of its twenty-five percent interest in the lease.[4]

This arrangement caused Beckham some anxiety. To ameliorate that concern, Mantle sent Beckham a letter in February 2005. The letter stated that the restrictions on assignment were "compelled by the trade with the Lessors in order to obtain consent to the assignment of your [Beckham and KLA] interest in the Lease." The letter then provided that:

In order to assure each of you [Beckham and KLA] that no action will be taken by Mantle . . . which is inimical to the interests of either of you, and in consideration of your respective continued participation in the exploration and development of the lands covered by the Lease, Mantle covenants and agrees as follows:

---

[4]In Mantle's assignment, the reference to the reservation read as follows:

There is excepted and reserved in Assignor [Mantle] the right to execute a release of Assignees' [Beckham and KLA] interest in all or any portion of the Lease on behalf of Assignees . . . without the joinder of either Assignee, in accordance with such a requirement imposed upon Assignor in connection with Assignor's obtaining the required consent of the Lessor to this Assignment, and otherwise to deal with the Lessor on behalf of Assignees . . . . Each of Assignees accepts the conveyance made herein subject to such reservation.

1.     Any action to be taken by Mantle which affects the leasehold interest of either Beckham or KLA shall be implemented in accordance with the terms and provisions of the applicable operating agreement which governs operations on the Lease.

2.     If a proposed action which affects the leasehold interest of either Beckham or KLA is not contemplated by the operating agreement, then Mantle will not act without first having discussed the proposed action with each of Beckham and KLA and obtained their respective consents to such action prior to its being taken.

### D. The Beginning of the End

In April 2005, Mantle proposed drilling a deep well, which would be known as Scanio-Shelton No. 6, by sending Beckham an authority for expenditure (AFE) inquiring as to whether Beckham would like to participate. Beckham chose to go non-consent. Mantle informed Beckham that it would be unable to complete the well without Beckham's participation. Beckham stood firm on its election not to participate.

At this same time, the May 2004 lease was nearing expiration because no new well had been drilled on the property for some time; thus, under the continuous drilling clause, the lease would expire on July 28, 2005. Mantle negotiated an amendment to the lease, changing the continuous drilling interval from 120 to 180 days, which extended the expiration date to September 28, 2005. The events that followed are disputed by the parties.

In sum, Beckham claims that in the summer and fall of 2005, Mantle entered secret negotiations with the Lessors to cut Beckham out of future operations on the lease. Beckham asserts that Mantle never told Beckham it was not going to drill the deep well that was initially proposed in April 2005 and, as a result, lose the May 2004 lease. Rather, Beckham contends that it was assured by Mantle that Mantle was obtaining an extension

6

of the lease with the Lessors and, in reliance on this representation, took no independent action to protect its interests. Beckham claims that it had a meeting with Mantle on October 4, 2005, at which time Mantle confirmed that the Lessors had agreed to an extension in exchange for the parties' agreement to construct a new road on the lease property; Beckham's share of this cost would have been $7,500. Beckham supports its version of the facts—that Mantle colluded with the Lessors to block Beckham out of the lease—with a letter sent by Mantle to the Lessors on the same date as Beckham's meeting with Mantle, which reads, in relevant part, as follows:

> The lease acquired by Mantle Resources, LLC, . . . (the "Original Lease") has terminated . . . . The termination was not entirely unexpected or unintended by Mantle Resources . . . . Mantle . . . had proposed a deep test on the lands covered by the lease, but Beckham Resources and [KLA], who owned interests in the lease, had elected not to participate in the proposed operation. This put a terrible burden on . . . Mantle, which would have been required to bear all of the costs of the well, subject to a payout of only 200% of what it cost to drill the well. This was inequitable and undesirable. . . .

> . . . .

> The new lease (the "New Lease") is intended to track the Original Lease with a few exceptions described as follows:

> . . . .

> ■ KEY: The consideration for the New Lease is the obligation to undertake the drilling of a well to a depth in excess of 9,000 feet below the surface. Making this well the consideration for the lease precludes Beckham and [KLA] from electing not to participate in the well if they desire to own any interest in the new lease. If they do not elect to join in the well, then we shall proceed with the New Lease. By failing to pay their respective shares of the required well, they are precluded from owning any interest in the New Lease, and the non-consent provisions of the applicable operating agreement do not come into play. If they do elect to join, we may abandon the effort to acquire a new lease and simply seek a renewal and extension of the Original Lease . . . .

7

Mantle asserts that it never told Beckham it had obtained the Lessors' actual agreement to an extension; instead, Mantle claims it merely told Beckham that it was negotiating with the Lessors for a possible extension. Further, Mantle contends that Beckham understood that the Scanio-Shelton No. 6 well was not viable without Beckham's participation but that Beckham was hoping that Mantle would nonetheless proceed so that Beckham could avoid the risks of investing while still reaping the benefits after Mantle recouped its 200% under the penalty clause of the non-consent provision. Mantle claims that it had no obligation to keep Beckham apprised of the exact nature of its negotiations with the Lessors.

### E. The October 2005 Lease

Mantle acquired a new lease with the Lessors with an effective date of October 18, 2005 (the October 2005 lease). The consideration for the lease was Mantle's agreement to drill a deep well on the property.[5] The October 2005 lease was meant to convey an interest in only the deep well rights on the property. To that end, the October 2005 lease expressly recognized that the May 2004 lease still existed with regard to any earned acreage and depths that had been attained under that lease.

---

[5]The relevant portion of the October 2005 lease read as follows:

> The consideration for the grant of this lease is the agreement of Lessee [Mantle] to undertake the drilling of a well in search of oil and/or gas at a legal location on the leased premises and which well (the "Consideration Well") shall be drilled to a depth in excess of 9,000 feet below the surface of the earth. Operations for the drilling of such well shall commence on or before sixty (60) days from the Effective Date, unless otherwise extended by Lessor. By drilling a well to a depth below 9,000 feet (but not necessarily completing the same), Lessee shall be deemed to have paid the entire consideration due for the purchase of this Lease.

Mantle negotiated and obtained a ninety-day extension of the primary term of the lease to allow for a delay in the commencement of drilling operations.

On October 26, 2005, Mantle sent Beckham a letter informing Beckham that the May 2004 lease had terminated, that Mantle had "negotiated a new lease covering the deep rights under" the May 2004 lease, and that:

> . . . [t]his letter is notice of the intention to drill a well intended to penetrate a depth of 10,000 feet, more or less.
>
> The drilling of this well is a part of the consideration for the purchase of the new lease. All parties desiring to own any interest in the new lease (i.e. the deep rights) must participate in the proposed well. Failure to participate in the proposed well . . . will mean that the non-consenting party has not shared in the consideration for the purchase of the new lease under the terms of the applicable Area of Mutual Interest Agreement [the AMI]. Accordingly, a party not sharing in the purchase terms of the lease does not own any interest therein. We bring this to your attention so that there will be no misunderstanding regarding your election as to participate or not.

An AFE for the estimated costs of the deep well was attached to the letter. The total estimated cost for the well was $1,135,000; Beckham's share for participating would be $255,375. Beckham did not respond to the October 26, 2005 notice. Mantle sent subsequent letters on December 6, 2005, December 30, 2005, January 3, 2006, and January 6, 2006, notifying Beckham of the October 2005 lease and offering Beckham the opportunity to participate. It is undisputed that Beckham declined the offers communicated by all of the letters. Beckham maintained that Mantle's offers were premature because the acquisition cost of the new lease—one of the "pertinent terms" required to be included under the AMI—was not ascertainable until the well had actually been completed. Beckham claimed that the estimated costs communicated by the AFEs attached to Mantle's letters did not comply with requirements of the AMI provision that all "pertinent terms" of the proposed acquisition be set forth in the notice.

9

To finance the deep well, Mantle sold an interest in the October 2005 lease to Miller, C.F. Funds, and Snyder. Their agreement, dated December 1, 2005, included the following caveat:

> It is understood and agreed by each of the Participants that the interests being acquired by them in the Test Well and the Deep Rights Lease are attributable to an interest to which certain third parties are entitled, but have waived their right to participate. Whether these parties have, in fact, waived their rights may be the subject of litigation. In the event that it is later judicially determined that such third parties are after all entitled to acquire their respective interests in the Deep Rights Lease, despite their having not participated in the drilling of the [deep well], each of Participants shall be required to divest itself of his or its interest in the Test Well and Deep Rights Lease . . . . Although Mantle . . . believe[s] that the third parties have effectively waived their rights to acquire any interest . . . as a result of their refusal to join in the drilling . . . when it was being undertaken (rather than after it has been drilled), the favorable outcome of any litigation brought to test the issue cannot be guaranteed . . . .

In January 2006, Mantle commenced drilling on the Scanio-Shelton No. 6 well, the deep well that served as consideration for the October 2005 lease. It reached a depth of 9,000 feet in mid-February 2006.

## F. The Litigation

On April 12, 2006, Beckham sued Mantle for breach of contract and breach of fiduciary duty. Specifically, Beckham alleged that Mantle had breached: (1) the AMI provision of the exploration agreement; (2) the non-consent provision of the JOA; (3) its promise in its February 2005 letter to take no action "inimical" to Beckham's interests; and (4) its fiduciary duty to Beckham that was allegedly created by the May 2004 lease assignment, in which Mantle undertook to deal exclusively with the Lessors on Beckham's behalf. Beckham filed a motion for partial summary judgment on May 17, 2007, arguing that Mantle had breached the AMI provision of the exploration agreement as a matter of

law because its offers to Beckham to participate in the October 2005 lease did not comply with the requirements of the provision.[6] By its motion for summary judgment, Beckham sought specific performance of a proper offer to participate in the wells drilled under the October 2005 lease and a declaratory judgment that the October 2005 lease is governed by the JOA, thus giving Beckham its right to "go non-consent" to the new deep wells. Mantle filed a response and cross-motion for partial summary judgment, arguing that it complied with the AMI provision as a matter of law. On September 14, 2007, the trial court denied Beckham's motion and granted Mantle's.

After this first round of dispositive motions, Beckham amended its petition to add claims for fraud and negligent misrepresentation. Thereafter, Mantle filed a motion for summary judgment on Beckham's claims for breach of the February 2005 letter agreement, breach of fiduciary duty, fraud, and negligent misrepresentation. Beckham filed a cross-motion for partial summary judgment, arguing that a fiduciary duty existed as a matter of law. On April 16, 2008, the trial court denied Beckham's cross-motion and partially granted Mantle's motion, disposing of all but Beckham's fraud and negligent misrepresentation claims. Those claims were tried to a jury in September 2008.[7] At the close of Beckham's case, however, the trial court granted an instructed verdict in favor of Mantle. Based on testimony by Mantle's attorneys, the trial court awarded Mantle $376,467.97 in attorneys' fees. This appeal ensued.

---

[6]This motion also asked for summary judgment on Mantle's counterclaim for tortious interference with an existing contract. However, the counterclaim was later abandoned by Mantle.

[7]The trial was based on Beckham's sixth amended petition, which included claims for fraud by misrepresentation, fraud by non-disclosure, statutory fraud, and negligent misrepresentation.

## II. DISCUSSION

## A. Motions for Summary Judgment

By its first and third issues, Beckham complains that the trial court erred in granting summary judgment in favor of Mantle and denying Beckham's motions for summary judgment on its various breach of contract and fiduciary duty claims.

## 1. Standard of Review

In a traditional summary judgment, the issue on appeal is whether the movant met the summary judgment burden by establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002). In reviewing a summary judgment, we consider the evidence in the light most favorable to the nonmovant, accepting as true all evidence favorable to the nonmovant, indulging every reasonable inference, and resolving any doubts in the nonmovant's favor. *Grant*, 73 S.W.3d at 215. "A party moving for summary judgment must establish its right to a summary judgment on the issues expressly presented to the trial court by conclusively proving all elements of its cause of action or defense as matter of law." *Elliot-Williams Co. v. Diaz*, 9 S.W.3d 801, 803 (Tex. 1999) (citations omitted). A defendant is entitled to summary judgment if it conclusively negates at least one essential element of the plaintiff's cause of action or establishes all the elements of an affirmative defense. *Am. Tobacco Co., Inc. v. Grinnell*, 951 S.W.2d 420, 425 (Tex. 1997). The summary judgment movant has conclusively established a matter if reasonable people could not differ as to the conclusion to be drawn from the evidence. *See City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005). "When

12

a trial court's order granting summary judgment does not specify the grounds relied upon, the reviewing court must affirm summary judgment if any of the summary judgment grounds are meritorious." *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000) (citing *Star-Telegram, Inc. v. Doe*, 915 S.W.2d 471, 473 (Tex. 1995)).

Although a party generally cannot appeal the denial of a motion for summary judgment, when both sides move for summary judgment and the trial court grants one motion and denies the other, the unsuccessful party may appeal both the prevailing party's motion and the denial of its own. *Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.*, 253 S.W.3d 184, 192 (Tex. 2007). In such a case, the appellate court should review both sides' summary judgment evidence, determine all questions presented, and render the judgment the trial court should have rendered. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *FM Props. Operating Co.*, 22 S.W.3d at 872.

### 2. Beckham's Motion for Summary Judgment

On May 17, 2007, Beckham filed the first motion for summary judgment in the case, arguing that Mantle had breached the parties' exploration agreement as a matter of law when its offer to appellants to participate in the October 2005 lease did not comply with the AMI provision of the exploration agreement.[8] In response, Mantle filed a cross-motion for

---

[8]In addition to traditional grounds, Beckham argued in its May 17, 2007 motion that it was entitled to summary judgment because there was "no evidence" that Mantle complied with the provisions of the exploration agreement. *See* TEX. R. CIV. P. 166a(i). However, a "no evidence" summary judgment is not available to plaintiffs arguing that their own claims are conclusively established by the evidence. *See id.* (stating that a party may be entitled to summary judgment on the ground that there is "no evidence of one or more essential elements of a claim or defense on which the *adverse party* would have the burden of proof at trial" (emphasis added)). Beckham's first issue is thus overruled to the extent it advances Beckham's "no evidence" ground for summary judgment.

In its motion for summary judgment, Beckham also argued that Mantle had breached the JOA as a matter of law by depriving Beckham of its right to go non-consent on the deep well. Beckham has not advanced this argument on appeal, however, so we do not address it. *See* TEX. R. APP. P. 38.1(i).

13

summary judgment claiming that Beckham did not prove all elements of the same claims, which was granted by the trial court and disposed of Beckham's claim for breach of the exploration agreement and JOA. By its first issue, Beckham complains that the trial court erred by denying its motion and granting Mantle's.

To recover for breach of contract, a plaintiff must prove: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach by the defendant; and (4) harm to the plaintiff as a result of the breach. *Adams v. H & H Meat Prods., Inc.*, 41 S.W.3d 762, 771 (Tex. App.–Corpus Christi 2001, no pet.). With regard to the interpretation of the contract, the parties here both contend—and we agree—that the AMI provision is unambiguous; they merely offer different interpretations of its meaning. *See Dynegy Midstream Servs., L.P. v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009) ("A contract is not ambiguous simply because the parties disagree over its meaning"). Thus, our primary concern in construing the contract is to ascertain and give effect to the parties' intentions as expressed in the document. *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 311-12 (Tex. 2005). We consider the entire writing and attempt to harmonize and give effect to all the contract's provisions so that none are rendered meaningless. *Id.* at 312; *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). Contract terms are given their plain, ordinary, and generally accepted meaning unless the instrument shows the parties used them in a technical or different sense. *Dynegy Midstream Servs., L.P.*, 294 S.W.3d at 168; *Heritage Res., Inc. v. Nations Bank*, 939 S.W.2d 118, 121 (Tex. 1996).

14

The AMI provision of the exploration agreement creates an obligation in any party who acquires a new "oil and gas mineral interest" within a defined land area surrounding the May 2004 lease property to offer the other party the opportunity to participate in that new acquisition for its proportionate share. To comply with the AMI, the AMI sets out that the acquiring party must send the other party written notice of the acquisition that includes "all pertinent terms" of the acquisition. The other party elects to participate by "giving written notice" to the acquiring party within ten days of receiving the notice. If the other party elects to participate, it is required to then pay its proportionate share of "all acquisition costs" within twenty days of its election. The AMI expressly provides that a party's "failure to timely elect or make its payment thereafter shall be deemed an election not to participate in the acquisition."

It is undisputed that the October 2005 lease was an "oil and gas mineral interest" as defined by the AMI and was within lands covered by the AMI. Beckham and Mantle's dispute centers around whether Mantle's notices to Beckham—i.e., the October 26, 2005, December 6, 2005, December 30, 2005, January 3, 2006, and January 6, 2006 letters—sufficed to trigger Beckham's right to elect to participate and thereafter make payment of its share of the acquisition costs.

Beckham argues that Mantle's offers to participate in the October 2005 lease did not comply with the AMI provision of the exploration agreement because the notice letters contained only the estimated costs of the well, rather than the actual acquisition costs, which Beckham contends were a "pertinent term" as required by the AMI provision. Beckham asserts that Mantle breached the AMI provision because it did not send notice

15

or an offer to participate to Beckham once the acquisition costs became known and ascertainable when the well reached 9,000 feet in February 2006.

Mantle argues that the October 2005 lease required the lessees to "absorb all the financial risk of drilling the initial deep well." To that end, Mantle contends that its letters to Beckham contained "all pertinent terms" of the acquisition, including specific discussions of the consideration for the lease being the agreement to drill a deep well, copies of the October 2005 lease, AFEs for the estimated drilling costs, and diagrams showing the proposed well location. We agree. To participate as a lessee, Beckham was required, upon receipt of the notice letter from Mantle, to send Mantle a written election and timely payment of its proportionate share of the acquisition costs. Mantle asserts that the AMI provision does not require that acquisition costs of "any new 'oil and gas mineral interest' be stated in the form of a liquidated sum" but merely that Beckham be informed of the terms for its participation—i.e., that Beckham would be responsible for its share of the up-front costs of the consideration well, which was the acquisition cost of the October 2005 lease. We believe this is the correct interpretation of the AMI provision of the exploration agreement. Thus, Mantle complied with the requirements of the AMI provision as a matter of law. *See Grinnell*, 951 S.W.2d at 425 (holding that a defendant is entitled to summary judgment if it conclusively negates one essential element of a plaintiff's claim). It sent Beckham multiple written notices of its acquisition of the May 2005 lease, offering Beckham the opportunity to participate. It is undisputed that Beckham never elected to participate in writing or made payment of its proportionate share of the acquisition costs. Under the terms of the AMI, Beckham's "failure to timely elect or make its payment" was an election not to participate in the acquisition of the October 2005 lease. *See Dynegy*

16

*Midstream Servs., L.P.*, 294 S.W.3d at 168 (requiring the reviewing court to give effect to the plain and ordinary meaning of contract terms). Thus, Beckham's claim for breach of the AMI provision of the exploration agreement fails as a matter of law, and we conclude that the trial court did not err in granting Mantle's motion for summary judgment regarding the AMI provision and denying Beckham's motion. *See Tex. Mun. Power Agency*, 253 S.W.3d at 192; *Dorsett*, 164 S.W.3d at 661. Beckham's first issue is overruled.

### 3. Mantle's Motion for Summary Judgment

On December 5, 2007, Mantle filed its motion for summary judgment arguing that Mantle did not breach the February 2005 letter agreement between the parties and that Mantle did not owe or breach any fiduciary duty with regard to Beckham. Beckham filed a cross-motion for partial summary judgment arguing that Mantle owed Beckham a fiduciary duty as a matter of law. The trial court granted Mantle's motion and denied Beckham's cross-motion. By its second issue on appeal, Beckham complains that the trial court erred in granting Mantle's motion for summary judgment and denying its partial cross-motion because (1) fact issues remain on the claim for breach of the letter agreement, and (2) Mantle owed Beckham a fiduciary duty as a matter of law and fact issues remain as to Mantle's alleged breach of that duty.

### a. Breach of the Letter Agreement

The February 2005 letter agreement provided that, "in order to assure [Beckham]" that Mantle will take no action "inimical" to Beckham's interests, Mantle "covenants and agrees" that (1) any action taken by Mantle affecting Beckham's leasehold interest "shall be implemented in accordance with the terms and provisions of the applicable operating

17

agreement which governs operations on the [May 2004] Lease"; and (2) if a proposed action affecting Beckham's leasehold interest is not contemplated by the operating agreement, Mantle will discuss the proposed action with Beckham and obtain its consent before acting.

By its clear terms, the February 2005 letter agreement obligates Mantle, in the event Mantle takes an action affecting Beckham's leasehold interest, to act in one of two ways. First, if the action is contemplated by the operating agreement, Mantle is required to implement it according to the terms and provisions of the operating agreement. Second, if the action is not contemplated by the operating agreement, Mantle must first notify Beckham and obtain its consent to the action before moving forward. Beckham appears to contend that the agreement also imposes on Mantle a general obligation to do nothing "inimical" to Beckham's interests. We disagree. Looking only to the plain and ordinary meaning of the terms of the letter agreement, we conclude that it imposes no such general duty. *See Dynegy Midstream Servs., L.P.*, 294 S.W.3d at 168; *see also City of the Colony v. N. Tex. Mun. Water Dist.*, 272 S.W.3d 699, 722 (Tex. App.–Fort Worth 2008, pet. filed) (holding that, unless the operative clauses of a contract are ambiguous, "'[a]s a general rule, recitals . . . will not control the operative clauses,'" and further, "'where the recitals are broader than the contract stipulations, the former will not extend the latter'" (quoting *Gardner v. Smith*, 168 S.W.2d 278, 280 (Tex. Civ. App.–Beaumont 1942, no writ)).

The question on appeal is, therefore, whether the October 2005 lease was an action contemplated by the applicable operating agreement (the JOA) and, accordingly, whether Mantle was obliged to notify Beckham and obtain its consent before entering into the new lease. The JOA contains a provision entitled "Acquisition, Maintenance or Transfer of

18

Interest," which outlines the procedure by which a party acquiring a renewal or replacement oil and gas lease affecting "lands within the Contract Area" must notify non-acquiring parties of the acquisition and allow them the opportunity to participate for their proportionate share. Our review of the JOA and its applicable exhibits reveals that the "Contract Area" includes the lands covered by both the May 2004 lease and the AMI provision of the exploration agreement. Because the October 2005 lease was negotiated and effectuated under the AMI provision of the exploration agreement, we conclude that Mantle's acquisition of the October 2005 lease was contemplated by the JOA and Mantle was, therefore, not obligated to notify Beckham and obtain its consent before proceeding with the October 2005 lease.

Thus, Mantle's only obligation was to act in accordance with the terms of the JOA. And as discussed above, Mantle so complied. Mantle sent Beckham multiple letters regarding its acquisition of the October 2005 lease; the letters notified Beckham of the acquisition and offered it the opportunity to participate by paying its proportionate share of the costs to drill the consideration deep well. It is undisputed that Beckham never elected to participate nor made payment of its proportionate share. Therefore, Mantle's actions in acquiring the October 2005 lease were in accordance with the terms of the JOA.

Based on the foregoing, we conclude that Mantle conclusively negated that it breached its obligations under the February 2005 letter agreement. *See Grinnell*, 951 S.W.2d at 425. As such, the trial court did not err in granting summary judgment in favor of Mantle on Beckham's claim that Mantle breached the letter agreement. Beckham's second issue is overruled to the extent it challenges this ground for Mantle's summary judgment.

19

**b. Fiduciary Duty**

With regard to Beckham's fiduciary duty claims, we must first address whether the trial court erred in granting Mantle's motion and denying Beckham's cross-motion for summary judgment on whether a fiduciary duty existed as a matter of law. *See Tex. Mun. Power Agency*, 253 S.W.3d at 192; *Dorsett*, 164 S.W.3d at 661. Beckham contends that Mantle acted as Beckham's agent in dealing with the Lessors. Agency is one type of formal relationship that imposes certain fiduciary duties on the parties. *Nat'l Plan Adm'rs, Inc. v. Nat'l Health Ins. Co.*, 235 S.W.3d 695, 700 (Tex. 2007) (citing *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 200 (Tex. 2002)). Whether a plaintiff and defendant have a formal fiduciary relationship, such as one based on agency, is a question of law. *Id.*; *First Nat'l Acceptance Co. v. Bishop*, 187 S.W.3d 710, 714 (Tex. App.–Corpus Christi 2006, no pet.).

An agent is defined as one authorized by another to transact business or manage some affair for the other. *Hartford Cas. Ins. Co. v. Walker County Agency, Inc.*, 808 S.W.2d 681, 687 (Tex. App.–Corpus Christi 1991, no writ). "An agent . . . consents to the control of another, the principal, where the principal manifests consent that the agent shall act for the principal." *Bishop*, 187 S.W.3d at 714. An agency relationship is not presumed; the party asserting the relationship bears the burden of proving it. *Id.* "The party claiming agency must prove the principal has both the right to assign the agent's task and the right to control the means and details by which the agent will accomplish the task. . . . The right of control is the 'supreme test' in establishing an agency relationship." *Id.* (citing *State*

20

*Farm Mut. Auto. Ins. Co. v. Traver*, 980 S.W.2d 625, 628 (Tex. 1998) (internal citation omitted)).

Even where a fiduciary duty does exist, we must nonetheless take into consideration all aspects of the relationship "when determining the nature of the fiduciary duty flowing between the parties." *Nat'l Plan Adm'rs, Inc.*, 235 S.W.3d at 700. Unless otherwise agreed, an agent's duty is to act solely for the benefit of the principal in all matters connected with the agency. *Id.* (citing RESTATEMENT (SECOND) OF AGENCY § 387 (1958)). However, the duties owed by the agent to the principal may be altered by agreement. *Id.*; *see Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 385 (Tex. 2000). Thus, "when determining the scope of an agent's fiduciary duty to [its] principal," we factor in both the nature and purpose of the relationship and the agreements between the parties. *Nat'l Plan Adm'rs, Inc.*, 235 S.W.3d at 700.

Beckham argues that an agency relationship between it and Mantle was created by (1) the May 2004 lease, (2) the May 2004 lease assignment from Mantle to Beckham, (3) the February 2005 letter agreement, and (4) the actions of Mantle. We disagree. First, although the May 2004 lease states that Mantle shall act "as the agent and attorney-in-fact" for Beckham, that statement is then immediately limited by the following: "It is agreed that the purpose of naming and appointing the Lessee [Mantle] . . . as the agent and attorney-in-fact is to allow the Lessor [the Scanio-Sheltons] to look to only one party for execution and delivery of any release provided for in the foregoing provision of this Lease." Thus, no agency relationship was created for purposes of the types of actions disputed in this case—i.e., the negotiation of a new lease for the deep well rights without Beckham's

21

participation and consent. *See Nat'l Plan Adm'rs, Inc.*, 235 S.W.3d at 700 (requiring the reviewing court to determine the scope of the agency relationship by looking to agreements between the parties).

With regard to the February 2005 letter agreement, Beckham appears to argue that its terms imposed on Mantle broad and general obligations to do "no harm" to Beckham and that this language somehow created an agency relationship. However, as previously discussed, the recital in the letter agreement "assur[ing]" Beckham that Mantle would take no action "inimical" to Beckham's interest does not supercede the specific operative terms of the letter agreement, which required only two things of Mantle—either that it act in accordance with the JOA or, if an action was not contemplated by the JOA, that it obtain Beckham's consent before moving forward. *See City of the Colony*, 272 S.W.3d at 722. Furthermore, the "no harm" language emphasized by Beckham does not evidence any intent on Mantle's part to transact business on behalf of Beckham or otherwise show that Beckham had the "right to assign [Mantle's] task and the right to control the means and details by which [Mantle] will accomplish the task." *See Hartford Cas. Ins. Co.*, 808 S.W.2d at 687; *Bishop*, 187 S.W.3d at 714.

Beckham also argues that the May 2004 lease assignment created an agency relationship between Beckham and Mantle. The assignment contains a provision stating that, "in accordance with . . . [the] requirement imposed upon [Mantle] in connection with [Mantle] obtaining the required consent of the Lessor[s]" to the assignment, there was "excepted and reserved" in Mantle a right to execute a release of Beckham's interest in the May 2004 lease. Beckham points to one phrase in the reservation provision—that Mantle has a right to "otherwise deal with the Lessor on behalf of [Beckham]"—and claims that it

22

is this language that creates the agency relationship. Emphasizing this language, Beckham asserts that Mantle's assignment to Beckham of its interest in the May 2004 lease is the "foundation of Beckham's claim of fiduciary duty." However, looking to the entirety of the provision, we conclude that the reservation provision in Mantle's assignment to Beckham merely restates the requirements in the assignment provision of the May 2004 lease with the Lessors. *See Frost Nat'l Bank*, 165 S.W.3d at 312 (requiring us to review the entire writing and attempt to harmonize and give effect to all the contract's provisions so that none are rendered meaningless).

Importantly, we note that the preceding documents all reference and/or were subject to the provisions of the JOA, and the JOA expressly disclaims the creation of any fiduciary relationship between Mantle and Beckham.[9] It states, in relevant part, that "[i]n their relations with each other under this agreement, the parties shall not be considered fiduciaries or to have established a confidential relationship but rather shall be free to act on an arms-length basis in accordance with their own respective self-interest." Thus, even if any agency relationship was created by the preceding documents, Mantle and Beckham's agreement in the JOA to disclaim a fiduciary relationship is arguably an alteration of that agency relationship.[10] *See Nat'l Plan Adm'rs, Inc.*, 235 S.W.3d at 700.

---

[9]Mantle also claims the absence of an agency relationship is evidenced by the exploration agreement's provision that "[t]he Parties expressly do not intend to create, and no provision hereof shall be construed as creating a partnership, joint venture, mining partnership, corporation, association or other relationship whereby any Party shall ever be held liable for the acts either by omission or commission, of the other . . . ." We are unpersuaded that this provision negates the existence of agency; it is clearly intended to disclaim liability as to claims by third-parties, and we will therefore not consider it as evidence either for or against agency. *See Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (requiring the reviewing court to consider the entire writing and attempt to harmonize and give effect to all the contract's provisions so that none are rendered meaningless).

[10]Beckham argues that the reservation in the May 2004 lease assignment—reserving in Mantle a right to "otherwise deal with the Lessors on [Beckham]'s behalf"—was not subject to the JOA and, thus, not included in the parties' disclaimer of fiduciary relationship. Even assuming this were the case, however, we

23

Neither do we agree that Mantle's conduct created an agency relationship. Beckham contends that Mantle's representations that it was negotiating, and would obtain, an extension of the May 2004 lease from the Lessors is evidence that it was acting on Beckham's behalf. Beckham further claims that there is evidence that Mantle was "calling the shots" in the letter sent by Mantle to the Lessors on October 4, 2005, which stated that Mantle would choose to renew the May 2004 lease if Beckham elected to join. However, we fail to see how either of these facts prove that Mantle was transacting business for Beckham or that Beckham was exercising control over or directing the actions of Mantle, which is the fundamental test for agency. *See Hartford Cas. Ins. Co.*, 808 S.W.2d at 687; *Bishop*, 187 S.W.3d at 714.

We therefore conclude, as a matter of law, that no fiduciary relationship existed between Mantle and Beckham. *See Grinnell*, 951 S.W.2d at 425. Even if the May 2004 lease and assignment and February 2005 letter agreement did create an agency between the parties, that agency was created for the limited purpose of Mantle obtaining a release from Beckham. *See Nat'l Plan Adm'rs, Inc.*, 235 S.W.3d at 700. Moreover, nothing in the conduct of Mantle or the agreements between the parties could be construed as evidence that Beckham exercised control over the actions of Mantle, which is the fundamental test of agency. *See Bishop*, 187 S.W.3d at 714. Thus, the trial court did not err in granting Mantle's motion and denying Beckham's cross-motion for partial summary judgment regarding the existence of a fiduciary relationship. *See Dorsett*, 164 S.W.3d at 661.

believe that this short phrase emphasized by Beckham is taken out of context of the remainder of the reservation provision, which is clearly a reiteration of the requirement of the May 2004 lease that Mantle have the right to execute a release on Beckham's behalf. *See id.* We are, therefore, unpersuaded by Beckham's argument.

Having concluded that no fiduciary duty exists as a matter of law, we need not reach Beckham's contention that fact issues exist as to any breach of that duty. Beckham's second issue is overruled to the extent it involves the trial court's summary judgment on its breach of fiduciary duty claim.

Having determined that the court did not err in granting the foregoing summary judgments, which disposed of all claims between Beckham and Mantle except for Beckham's claims for fraud and negligent misrepresentation, we will now analyze the propriety of the trial court's instructed verdict on these remaining claims.

## B. Instructed Verdict

By its third issue, Beckham argues that fact issues were raised at trial on its fraud and negligent misrepresentation claims, and therefore, the trial court's instructed verdict was erroneous. Beckham pled three theories of fraud—fraud by misrepresentation, fraud by non-disclosure, and statutory fraud—and one claim of negligent misrepresentation.

### 1. Standard of Review

"In reviewing the granting of an instructed verdict, we must determine whether there is any evidence of probative force to raise a fact issue on the material questions presented." *Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649 (Tex. 1994) (citation omitted). An instructed verdict in favor of the defendant is proper if the plaintiff fails to present evidence in support of an essential fact or where a defense to a plaintiff's cause of action is conclusively proved. *See Villegas v. Griffin Indus.*, 975 S.W.2d 745, 748-49 (Tex. App.–Corpus Christi 1998, pet. denied). In reviewing an instructed verdict, we view the evidence in the light most favorable to the non-movant, disregard all conflicts in the

25

evidence, and afford the non-movant the benefit of all reasonable inferences arising from the evidence. *Szczepanik*, 883 S.W.2d at 649. "If there is any conflicting evidence of probative value on any theory of recovery, an instructed verdict is improper and the case must be reversed and remanded for jury determination of that issue." *Id.*

## 2. Fraud by Misrepresentation

In its fraud by misrepresentation claim, Beckham alleged that Mantle "misrepresented to Beckham and KLA in May through October 2005 that it was requesting from and negotiating with the landowners an extension or renewal to the May [2004] Lease" and "that it would acquire such an extension or renewal in exchange for the repair of certain lease roads and that the lessors were agreeable." Mantle argues that the alleged misrepresentation amounts to an alleged oral promise by Mantle to extend the May 2004 lease, a promise which would have been barred by the statute of frauds because agreements to extend leases must be in writing and signed by the person to be charged.[11] *See* TEX. BUS. & COM. CODE ANN. § 26.01 (Vernon 2009); *Duke v. Sun Oil Co.*, 320 F.2d 853, 858 n.5 (5th Cir. 1963). Mantle contends that the damages sought by Beckham for the alleged fraud are the benefits of this bargain that is unenforceable under the statute of frauds; in other words, Mantle argues, Beckham's fraud claim is merely an attempt to

---

[11]Beckham disagrees with this characterization of its fraud by misrepresentation claim. Beckham contends in its brief that "the fraud and damages do not arise from a promise to convey real property; rather, they arise from Mantle's misrepresentation to Appellants that it was requesting and negotiating for an extension of a lease on Appellant's behalf, when, in fact, it was not." We do not agree with this depiction of Beckham's claim. The misrepresentation actually pled by Beckham in its petition—that Mantle represented to Beckham that "it *would acquire* such an extension or renewal in exchange for the repair of certain lease roads and that the lessors were agreeable"—belies the characterization of the misrepresentation Beckham now advances on appeal. (Emphasis added.)

26

indirectly recover for the breach of an otherwise unenforceable promise and is therefore barred.  *See Haase v. Glazner*, 62 S.W.3d 795, 799 (Tex. 2001).

An agreement to extend an oil and gas lease must be in writing in order be enforceable.  *Duke*, 320 F.2d at 858 n.5 (internal citation omitted) (reasoning that an oil and gas lease is a transfer and conveyance of real property and must thus comply with the statute of frauds to be enforceable).  Here, we agree with Mantle that the oral promise to obtain an extension of the May 2004 lease alleged by Beckham is just such an agreement, and because it was not in writing, it is unenforceable under the statute of frauds.  The statute of frauds is meant to "prevent fraud and perjury in certain kinds of transactions by requiring agreements to be set out in a writing signed by the parties."  *Haase*, 62 S.W.3d at 799.  A party to an agreement may not frustrate the purpose of the statute and avoid its requirements by employing a fraud claim to "essentially enforce a contract the [statute of frauds] makes unenforceable."  *Id.*; *see also Quigley v. Bennett*, 227 S.W.3d 51, 54-55 (Tex. 2007) (disallowing recovery of fraud damages where those damages consisted of an overriding royalty interest that had been orally promised to plaintiff and was thus barred by the statute of frauds).  This means that the statute of frauds operates to bar a fraud claim when that claim stems from an unenforceable contract and seeks benefit-of-the-bargain damages.  *Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 636 (Tex. 2007); *Case Corp. v. Hi-Class Bus. Sys. of Am., Inc.*, 184 S.W.3d 760, 777 (Tex. App.–Dallas 2005, pet. denied).  The statute of frauds does not, however, bar recovery for fraud based on reliance or out-of-pocket damages.  *Sonnichsen*, 221 S.W.3d at 636; *Haase*, 62 S.W.3d at 799-800.  Thus, "[t]he viability of [Beckham]'s fraud claim depends upon the nature of the

27

damages [it] seeks to recover." *Sonnichsen*, 221 S.W.3d at 636. Out-of-pocket, or reliance, damages are restitutionary and measure the difference between the value of that which was parted with and the value of that which was received. *Id.* Benefit-of-the-bargain damages derive from an expectancy theory and measure the difference between the value that was represented and the value actually received. *Id.*

At trial, Beckham's damages evidence consisted of testimony and exhibits attempting to prove up the value of the deep rights under the October 2005 lease. On appeal, Beckham contends that it seeks more than benefit-of-the-bargain damages, arguing that it "pled for and put on evidence of out-of-pocket damages, consequential damages, disgorgement of profits, the imposition of a constructive trust, exemplary damages, and other damages . . . ." However, the damages sought by Beckham are essentially the benefits it expected when Mantle allegedly did not honor its alleged oral promise to obtain an extension of the May 2004 lease. The consequential damages claimed by Beckham were the loss of its deep rights under the May 2004 lease—which is, in other words, a benefit Beckham expected if Mantle had honored its alleged promise to extend the May 2004 lease. *See Sonnichsen*, 221 S.W.3d at 636 (holding that benefit-of-the-bargain damages are those "benefits [that] would have arisen only if" the alleged contract had been honored). Moreover, disgorgement of profits is not a type of out-of-pocket damages. *See Case Corp.*, 184 S.W.3d at 778-79 (citing *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 49-50 (Tex. 1998)). Furthermore, our review of the trial record reveals no other evidence that Beckham "parted with" anything of value in reliance on Mantle's alleged oral promise to extend the May 2004 lease. *See Sonnichsen*, 221 S.W.3d at 636. In fact, Beckham's own contention that it

28

refrained from taking any action because of Mantle's alleged misrepresentation militates against a finding that it suffered any reliance or out-of-pocket damages.[12]

We conclude that Beckham's fraud by misrepresentation claim seeks only benefit-of-the-bargain damages and is thus barred by the statute of frauds. *See id.*; *Haase*, 62 S.W.3d at 799-800. Therefore, the trial court did not err in granting Mantle's motion for instructed verdict on Beckham's fraud by misrepresentation claim. *See Villegas*, 975 S.W.2d at 748-49 (holding that an instructed verdict is proper when a defense to a plaintiff's cause of action is conclusively proved). We overrule Beckham's third issue insofar as it concerns this claim.

### 3. Fraud by Non-Disclosure

Beckham alleged that Mantle committed fraud by non-disclosure when it failed to inform Beckham that it was negotiating and obtaining the October 2005 lease from the Lessors. In its motion for instructed verdict and on appeal, Mantle argues that it owed no fiduciary duty to Beckham and, thus, had no duty to disclose that it was negotiating a new lease with the Lessors for the deep well rights on the property. We agree.

"'[A] failure to disclose information does not constitute fraud unless there is a duty to disclose the information.'" *Playboy Enters., Inc. v. Editorial Caballero, S.A. de C.V.*, 202

---

[12]Beckham argues that, regardless of the nature of its other claimed damages, the statute of frauds does not bar the creation of a constructive trust relating to real property. *See Procom Energy, L.L.A. v. Roach*, 16 S.W.3d 377, 381 (Tex. App.–Tyler 2000, pet. denied). However, Beckham cites only half the rule of law from its relied-upon authority—the complete rule related to the survival of constructive trusts is that "the Statute of Frauds is not a bar to the creation of a constructive trust arising from an abuse of a confidential or fiduciary relationship in the context of a parol transaction." *Id.* (citing *Gaines v. Hamman*, 358 S.W.2d 557, 560 (Tex. 1962); *Smith v. Bolin*, 271 S.W.2d 93, 96-97 (Tex. 1954); *Fitz-Gerald v. Hull*, 237 S.W.2d 256, 261 (Tex. 1951); *Grace v. Zimmerman*, 853 S.W.2d 92, 97 (Tex. App.–Houston [14th Dist.] 1993, no writ)). Having already determined that no fiduciary relationship existed between Beckham and Mantle, we are unpersuaded by Beckham's argument.

S.W.3d 250, 259 (Tex. App.–Corpus Christi 2006, pet. denied) (quoting *Bradford v. Vento*, 48 S.W.3d 749, 756 (Tex. 2001) (internal citation omitted)). "Generally, no duty of disclosure arises without evidence of a confidential or fiduciary relationship." *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998).[13] As previously discussed, the trial court correctly granted Mantle's motion for summary judgment and denied Beckham's partial motion for summary judgment on the existence of a fiduciary relationship between the parties. Having affirmed the trial court's decision that no fiduciary duty existed between Mantle and Beckham as a matter of law, we conclude that Mantle owed Beckham no duty to disclose its negotiations of the October 2005 lease, and accordingly, the trial court did not err in granting an instructed verdict on Beckham's claim for fraud by non-disclosure. *See Villegas*, 975 S.W.2d at 748-49. Beckham's third issue is overruled to the extent it challenges the trial court's instructed verdict on fraud by non-disclosure.

### 4. Statutory Fraud

Beckham's statutory fraud claim is based on Mantle's assignment to Beckham of its interest in the May 2004 lease. Beckham alleged in its petition that because the assignment is a "transaction involving real estate," Mantle committed statutory fraud when it induced Beckham to accept the lease assignment by making "false promises" in the February 2005 letter agreement to take no action "inimical to Beckham" and "to notify

---

[13]We note that a duty to disclose information can be imposed by other circumstances. In addition to situations in which there is a fiduciary or confidential relationship, "a duty to speak may arise in an arms-length transaction in at least three other situations: (1) when one voluntarily discloses information, he has a duty to disclose the whole truth; (2) when one makes a representation, he has a duty to disclose new information when the new information makes the earlier representation misleading or untrue; and (3) when one makes a partial disclosure and conveys a false impression, he has the duty to speak." *Playboy Enters., Inc. v. Editorial Caballero, S.A. de C.V.*, 202 S.W.3d 250, 260 (Tex. App.–Corpus Christi 2006, pet. denied). However, Beckham has not raised these arguments, in either the proceedings on Mantle's motion for instructed verdict or now on appeal, so we do not address them in this opinion. *See* TEX. R. APP. P. 33.1(a).

Beckham . . . in the event [Mantle] took any action involving [Beckham's] interest" in the May 2004 lease, promises which Mantle had no intention to fulfill. *See* TEX. BUS. & COM. CODE ANN. § 27.01(a)(2) (Vernon 2009).

The business and commerce code provides that, in a transaction involving real estate, fraud consists of a "false promise to do an act" that is material, not intended to be fulfilled, made for the purpose of inducing the other party to enter a contract, and relied on by the other party in entering the contract. *Id.* In our analysis of the motion for summary judgment on Beckham's claim for breach of the February 2005 letter agreement, we determined as a matter of law that the letter agreement created no general obligation—i.e., promise—for Mantle to take no actions inimical to Beckham's interest. Neither can we conclude that the letter agreement contains a general promise that Mantle notify Beckham if it takes *any* action involving Beckham's interest in the May 2004 lease. Rather, as we have previously determined as a matter of law, the letter agreement obligated Mantle to notify Beckham *only* in the event that Mantle takes an action affecting Beckham's interest that is not contemplated by the JOA. Because the February 2005 letter agreement does not even contain either of the promises alleged by Beckham, we cannot conclude that those non-existent promises were false. As such, Beckham cannot prove an essential element of its statutory fraud claim, and the trial court did not err in granting an instructed verdict on the claim. *See id.*; *Villegas*, 975 S.W.2d at 748-49. Beckham's third issue is overruled to the extent it challenges the trial court's instructed verdict on its statutory fraud claim.

### 5. Negligent Misrepresentation

The final claim tried to the jury was Beckham's claim for negligent misrepresentation, in which it alleged that Mantle negligently "represented to Beckham . . . on numerous occasions between May and October of 2005 that Mantle would secure, or at least attempt to secure, a renewal of the May [2004] Lease as to the deeper depths at a minimal cost."

To recover for negligent misrepresentation, Beckham was required to prove that Mantle, in the course of a transaction in which it had a pecuniary interest and without exercising reasonable care, supplied false information for the guidance of Beckham and caused pecuniary loss to Beckham because of Beckham's justifiable reliance on the false information. *See McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787, 791 (Tex. 1999) (citing RESTATEMENT (SECOND) OF TORTS § 552 (1977)). Importantly, the false information complained of in a negligent misrepresentation claim "must be a misstatement of an existing fact rather than a promise of future conduct." *Scherer v. Angell*, 253 S.W.3d 777, 781 (Tex. App.–Amarillo 2007, no pet.) (citing *Miller v. Raytheon Aircraft Co.*, 229 S.W.3d 358, 379 (Tex. App.–Houston [1st Dist.] 2007, no pet.)); *see also C.E. Barker, Inc. v. FirstCapital Bank*, No. 13-03-00421-CV, 2005 WL 1177910, at *4 (Tex. App.–Corpus Christi May 19, 2005, pet. denied) (mem. op.). Here, the alleged false information—that Mantle "would secure, or at least attempt to secure," a renewal of the May 2004 lease—is a promise of future conduct.[14] At the time of its

---

[14]In its brief, Beckham argues that its negligent misrepresentation claim was not based on:

> . . . a promise to do something in the future. Rather, it was a deliberate falsehood as to what Mantle was doing in real time, to wit: "we are working on obtaining a lease extension," the extension "won't be a problem," and "the lease extension will be obtained [for the cost of constructing a new road on the property]."

communication, no extension or renewal of the May 2004 lease had been accomplished, and any promise related to a possible yet, at that point, non-existent renewal was not actionable as a negligent misrepresentation. *See Scherer*, 253 S.W.3d at 781; *see also C.E. Barker, Inc.*, 2005 WL 1177910, at *4. Absent any false information, Beckham was unable to prove this essential element, and the trial court correctly granted Mantle's motion for instructed verdict on Beckham's negligent misrepresentation claim. *See McCamish, Martin, Brown & Loeffler*, 991 S.W.2d at 791; *Villegas*, 975 S.W.2d at 748-49. Beckham's third issue is overruled insofar as it relates to this claim.

## C. Attorney's Fees

By its fourth and final issue, Beckham argues that the trial court erred in awarding Mantle attorneys' fees because no evidence supported the award and the fees were not segregated between causes of action for which and parties for whom fees are available and those for which and for whom fees are unavailable. Under Texas law, a prevailing party may recover attorney's fees only if provided for by statute or a contract between the parties. *Intercont'l Group P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 653 (Tex. 2009); *Tony Gullo Motors v. Chapa*, 212 S.W.3d 299, 310 (Tex. 2006). And it is true that "if any attorney's fees relate solely to a claim for which such fees are unrecoverable, a claimant must segregate recoverable from unrecoverable fees." *Chapa*, 212 S.W.3d at 313; *see also City of Austin v. Roberson*, No. 13-06-00218-CV, 2008 WL 802315, at *4

---

Again, we do not agree with Beckham's characterization of its claim on appeal. As pled by Beckham in its sixth amended petition, the live pleading for Beckham at the time of trial, the complained-of false information was Mantle's alleged representation that it "*would* secure, or at least *attempt* to secure," a renewal of the May 2004 lease. (Emphasis added.) This language clearly complains of a promise to do a future act, and we do not countenance Beckham's attempt to recast the claim now on appeal. *See Scherer v. Angell*, 253 S.W.3d 777, 781 (Tex. App.–Amarillo 2007, no pet.) (basing its determination of the relevant alleged false promise on the claim as pled in the plaintiff's petition that was live at the time of trial).

(Tex. App.–Corpus Christi Mar. 27, 2008, no pet.) (mem. op.).  However, it is also true that parties are free to adopt a more liberal standard for recovery of attorney's fees, and when they do so, we must give effect to and enforce the agreement as written.  *Intercont'l*, 295 S.W.3d at 653; *Wayne v. A.V.A. Vending, Inc.*, 52 S.W.3d 412, 417 (Tex. App.–Corpus Christi 2001, pet. denied).

Here, Beckham and Mantle's exploration and development agreement contained a clause providing for attorney's fees, which reads as follows:

> If any Party should hereafter institute litigation against any other Party alleging that such other Party has breached this Agreement or any contracts or other instrument delivered pursuant hereto, the non-prevailing Party or Parties (whether plaintiff or defendant) in such action shall reimburse the prevailing Party for the prevailing Party's reasonable attorneys' fees, witness costs, court costs, and all other reasonable costs in connection with such litigation.

Although neither party raises it, we believe there is ambiguity within this provision of the agreement.  *See Sage St. Assocs. v. Northdale Constr. Co.*, 863 S.W.2d 438, 445 (Tex. 1993) (holding that a court may determine ambiguity as a matter of law for the first time on appeal); *see also City of Alton v. Sharyland Water Supply Corp.*, 277 S.W.3d 132, 150 (Tex. App.–Corpus Christi 2009, pet. filed) (same).  "Deciding whether a contract is ambiguous is a question of law for the court." *J.M. Davidson v. Webster*, 128 S.W.3d 223, (Tex. 2003) (citing *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983)).  In construing a written contract, our primary concern is to ascertain the true intentions of the parties as expressed in the instrument.  *Id.*  A contract is not ambiguous if it can be given a definite or certain legal meaning.  *Id.*; *City of Alton*, 277 S.W.3d at 150.  On the other hand, if the contract is subject to two or more reasonable interpretations, the contract is ambiguous and a fact issue exists on the parties' intent.  *Coker*, 650 S.W.2d at 393-94.  Discerning the

34

parties' intent is a determination left to the exclusive province of the fact finder. *Id.* at 394-95.

In this case, we cannot give the attorneys' fees provision in the exploration agreement a definite or certain legal meaning because it is unclear whether the provision covers all claims in litigation by one party against the other or merely claims for breach of the exploration agreement and related contracts. The provision states that "if any Party should . . . institute litigation against any other Party *alleging*" breach of the agreement or related contracts, the prevailing party shall recover his attorneys' fees and other costs "in connection with *such litigation*." (Emphasis added.) "Such litigation" could be construed as referring to a lawsuit for "breaching this [exploration] Agreement or other instrument delivered pursuant hereto," such that the prevailing party could only recover fees for a breach of contract claim. Or, the same phrase could refer to a lawsuit instituted by one party against another that contains a breach of contract allegation, in which case the prevailing party may recover all of its fees, no matter whether the lawsuit includes claims sounding in contract and in tort. It is the provision's use of the word "alleging" that creates the uncertainty. Because it is subject to two reasonable interpretations, we conclude, as a matter of law, that the provision is ambiguous. *See id.* at 393-94.

Although we believe the attorney's fees provision in the exploration agreement is ambiguous, we cannot determine whether the trial court so concluded because no findings of fact or conclusions of law were filed in this case. When no findings of fact or conclusions of law are filed, we presume the trial court made all necessary findings to support the judgment. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990); *Cadle Co. v. Ortiz*, 227 S.W.3d 831, 834 (Tex. App.–Corpus Christi 2007, pet. denied). In its final

35

judgment, the trial court determined that Mantle was the prevailing party in the dispute with Beckham and was "entitled to an award of attorney's fees and expenses" under the provisions of the exploration agreement. The judgment states that the court "received evidence concerning Mantle's entitlement" to fees and that Beckham's "contract claims are intertwined with its other claims." The trial court then awarded Mantle $376,467.97 "in necessary and reasonable attorney's fees . . . ." Based on our review of the record, this dollar figure represents an amount equal to or very close to the fees requested by Mantle's attorneys for their services on *all* of Beckham's claims—i.e., this amount did not reflect segregation of those fees for services solely attributable to Beckham's tort claims. *See Chapa*, 212 S.W.3d at 313 (requiring segregation for fees relating solely to claims for which fees are not recoverable).

In the absence of findings of fact or conclusions of law, we must presume the trial court both correctly concluded that the attorneys' fees provision in the exploration agreement was ambiguous and correctly construed it as providing for all fees incurred by Mantle in defending against the entirety of Beckham's lawsuit. *See Worford*, 801 S.W.2d at 109; *Cadle Co.*, 227 S.W.3d at 834; *Coker*, 650 S.W.2d at 394-95 (holding that the determination of the parties' true intent is a matter for the trier of fact); *see also Inglish v. Machen*, No. 01-98-01267-CV, 2001 WL 832356, at *3 (Tex. App.–Houston [1st Dist.] July 19, 2001, no pet.) (mem. op.). This construction of the attorney's fee provision did not limit Mantle's recovery to only those fees incurred in defending against the breach of contract claims, and Mantle was, thus, not required to segregate its fees by recoverable and unrecoverable claims. *See Intercont'l*, 295 S.W.3d at 653; *Wayne*, 52 S.W.3d at 417 (holding that parties are free to contract for a liberal fee-recovery standard). The trial court

did not err in awarding Mantle all of its fees under the exploration agreement. *See Intercont'l*, 295 S.W.3d at 653 (providing for the recovery of attorney's fees pursuant to a contract between the parties). Beckham's fourth issue is overruled.[15]

### III. CONCLUSION

The judgment of the trial court is affirmed.


NELDA V. RODRIGUEZ
Justice

Delivered and filed the 25th
day of February, 2010.

---

[15]Beckham also argues that the trial court erred by awarding fees to Mantle pursuant to its declaratory judgment action. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 37.009 (Vernon 2008). However, having affirmed the trial court's award based on the contract between the parties, we need not reach this contention. *See* TEX. R. APP. P. 47.1.